Cesar PERALES, as Commissioner of the New York State Department of Social Services, the New York State Department of Social Services, Robert Abrams, as Attorney General of the State of New York, and on behalf of the People of the State of New York, the State of New York, and the City of New York, and Sara Doe, Jane Roe, and Anne Coe, individually, on behalf of their minor children, and on behalf of all others similarly situated and their minor children, Plaintiffs,

and

Fran Foe, Mary Moe, Linda Loe, Susan Soe and Zelda Zoe, individually, on behalf of all others similarly situated and their minor children, Plaintiffs–Intervenors,

v.

Richard THORNBURGH, as Attorney General of the United States, Terrance O'Reilly, as Assistant Commissioner of the Immigration and Naturalization Service, Edward Wildblood, as Legalization Director of the INS Eastern Regional Office, Gilbert Tabor, as INS Eastern Regional Processing Facility Director, Scott Blackman as INS District Director of the New York District, and Louis Sullivan, as Secretary of Health and Human Services, Defendants.

No. 88 Civ. 2265 (KC).

United States District Court,
S.D. New York.

April 18, 1991.

Main Street Legal Services, Inc., Flushing, N.Y. (Stephen Loffredo, of counsel), White & Case, Robert L. Abrams, Atty. Gen. of State of N.Y. (Charles F. Sanders, Asst. Atty. Gen.), Victor A. Kovner, Corp. Counsel to the City of New York (Hilary Klein, Gail Rosenchein, Asst. Corp. Counsel), New York City, for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Diogenes P. Kekatos, Bart G. Van De Weghe, Asst. U.S. Attys., Timothy MacFall, Sp. Asst. U.S. Atty.), New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge:

This action was filed barely a month before the expiration of a one-year period of amnesty for undocumented aliens which had been authorized by the Congress in landmark immigration legislation. The plaintiffs here claim, in substance, that certain regulations issued by the Attorney General to implement the legislation were constitutionally and statutorily defective, causing a deprivation of their rights. Pro-

ceeding initially by order to show cause, they asked the Court to extend the deadline, notwithstanding the clear expression of the Congress—both in enacting the legislation and in later refusing to extend the deadline—that the rights conferred by the statute would expire on May 4, 1988. This we declined to do, ruling that, under the doctrines of equitable tolling and constructive filing, the plaintiffs could obtain the relief being sought if they could establish at trial the merits of their attack on the regulations and either affirmative misconduct by the Government or sufficiently concrete and definitive steps taken by the plaintiff aliens to apply for the benefits *before* the expiration of the filing deadline. A trial having been had, we conclude, principally, that plaintiffs have failed to establish the merits of their statutory and regulatory claims. Even if those claims were established, plaintiffs have not shown either affirmative misconduct by the Government, which would permit application of the doctrine of equitable tolling of the deadline, or constructive filing by the alien plaintiffs before the expiration of the deadline. We now elaborate upon these conclusions.

This class action challenges certain aspects of the administration by the Immigration and Naturalization Service ("INS") of the legalization program created by the Immigration Reform and Control Act of 1986, Title II, § 201(a), Pub.L. No. 99–603, 100 Stat. 3394 *et seq.* ("IRCA", "the Statute", or "the Act"), codified primarily at Section 245a of the Immigration and Nationality Act of 1952, as amended ("INA"), 8 U.S.C. § 1255a (1988). The regulations in question relate to the "public charge" ground of exclusion from the legalization program. Generally, if an applicant was found to be likely to become a public charge, he could be found ineligible for the benefits created by the statute. Plaintiffs—individual aliens, class representatives, and governmental entities—allege that INS's public charge regulations were

unlawfully restrictive, that INS disseminated these defective regulatory standards to the public, and that, as a result, eligible aliens disqualified themselves from the legalization program. Plaintiffs allege violations of IRCA, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 552 *et seq.* (1986),[1] and the Fifth Amendment to the United States Constitution. Plaintiffs seek declaratory, injunctive and mandamus relief.

The Government denies these allegations, disputes the justiciability of this action, the standing of the governmental plaintiffs, and the Court's subject matter jurisdiction, and maintains that the Court does not have the authority to grant the relief sought by the plaintiffs.

After pretrial proceedings, described below, the case was tried without a jury from October 9 through October 17, 1990. The parties filed post-trial briefs on December 5, 1990, and further letter advice on February 22, 1991. This opinion and order constitutes the Court's findings of fact and conclusions of law.

I. *Statutory and Regulatory Background*

IRCA became law on November 6, 1986. It was the result of a protracted and complex national debate on immigration policy that acknowledged the existence in this country of a large population of undocumented aliens and the pervasive impact of this population upon America's agricultural economy, migrant labor conditions, and urban landscape. Ever growing social welfare expenditures by states, like New York, California, Texas and Florida, with large concentrations of illegal aliens, were a significant factor in developing the political consensus that led to the passage of the legislation. In essence, the statute sought to deal a) with illegal aliens already in the country, by giving them a one-year amnesty period to qualify for lawful status, thereby drawing them out of outlaw status

---

1. Although a violation of the APA is conclusorily alleged in the complaint, plaintiffs have not pursued this allegation, either in pre-trial proceedings or at trial, focussing instead on the alleged violations of IRCA and the Constitution. Accordingly, we deem plaintiffs to have abandoned this theory of liability, and we do not address it further.

and an economic and legal no-man's land, and b) with future illegal aliens, by making it unlawful for United States employers to hire undocumented persons who are not legally authorized to work, thereby creating disincentives to future migration. American agricultural workers stood to benefit from this new policy because they would no longer lose jobs to illegal aliens laboring at sub-standard wages. Another beneficiary would be American cities and counties, whose social welfare obligations to a large alien constituency would decrease as aliens surfaced and joined the mainstream economy or declined to immigrate because of a shrinking job market.

The statute established a legalization program for qualified aliens who had resided in the United States unlawfully since before January 1, 1982, and required the Attorney General to designate a twelve-month period during which prospective legalization applicants could apply for legalization. 8 U.S.C. § 1255(a)(1)(A). Because the Congress required the Attorney General to start the twelve-month application period on a date not later than 180 days after November 6, 1986, *id.*, it appears that Congress intended to foreclose any applications for benefits filed after May 4, 1988. The Attorney General designated May 5, 1987, through May 4, 1988 as the twelve-month application period. 8 C.F.R. § 245a.2(a)(1).

Congress specified certain formal requirements that an applicant for legalization had to satisfy. Under IRCA, an illegal alien could adjust his status to that of a lawful permanent resident if he could prove that he had: (1) made a timely application, (2) resided in the United States since before January 1, 1982, (3) resided here continuously since the enactment of the statute in November 1986, and (4) was admissible as an immigrant. 8 U.S.C. § 1255a(a)(1)–(4). As is customary, Congress delegated to the Attorney General authority to issue detailed regulations that would govern implementation of the Act. 8 U.S.C. § 1255a(g)(1).

During the long Congressional debate that preceded enactment of IRCA, advocacy groups for the alien population argued that, because of mistrust of the INS endemic in the immigrant population, a buffer had to be created between the alien and the Government if the legalization program was to succeed. Accordingly, to facilitate its effort to reach the large number of potential but hidden beneficiaries of IRCA, INS certified, pursuant to 8 U.S.C. § 1255a(c) & (i), approximately twelve hundred private organizations as "Qualified Designated Entities" ("QDEs"). They were classified in two categories: "National Coordinating Agencies" ("NCAs") and "Direct Service Providers" ("DSPs").

INS entered into a written agreement with each NCA which required the NCA to cooperate and coordinate with INS in the training of DSPs, both initially and on an as-needed basis, to provide technical assistance to DSP sites, to distribute public information materials prepared by the INS for the legalization program, to participate in the INS Outreach training program and to provide instruction to non-affiliated Service Providers and other community organizations as necessary. INS also entered into a written agreement with each DSP which required the DSP to distribute forms and provide information regarding legalization eligibility requirements to interested persons, to review legalization applications and assist prospective legalization claimants, and to publicize the availability of the DSPs' services through local media, churches, schools and community organizations.

These written agreements with the QDEs contemplated that the INS would provide technical training and assistance to DSPs; provide, initially and on an as-needed basis, formal training sessions and materials to NCAs, their affiliates and independent DSPs; and monitor the quality of the services being provided through the QDEs. INS certified over sixty organizations in New York State as QDEs.

Beginning on January 20, 1987, INS issued and disseminated to the public the regulations that would govern eligibility for legalization, including a "public charge" ground of exclusion from the le-

galization program. These public charge regulations are at the heart of this case.

IRCA's requirement that legalization candidates be "admissible as immigrans," 8 U.S.C. § 1255a(a)(4), refers to and incorporates the exclusion provisions of Section 212(a) of the Immigration and Nationality Act of 1952, as amended ("INA"). One class of aliens not "admissible as immigrants" under INA Section 212(a) is the class of aliens who, "in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges." Section 212(a)(15) of the INA, 8 U.S.C. § 1182(a)(15). Thus, Congress's requirement in IRCA that a legalization applicant prove that he is "admissible as an immigrant," 8 U.S.C. § 1255a(a)(4), requires the Attorney General or his designee to make a determination regarding an alien's ability to be self-supporting in the United States.

For IRCA legalization applicants, Congress also created certain exceptions to the general provisions of 8 U.S.C. § 1182(a)(15) and provided a "Special Rule for Determination of Public Charge" (the "Special Rule"). The Special Rule states:

> An alien is not ineligible for adjustment of status under this section due to being inadmissible under section 1182(a)(15) of this title [the "public charge" exclusion] if the alien demonstrates a history of employment in the United States evidencing *self-support* without receipt of public cash assistance.

8 U.S.C. § 1255a(d)(2)(B)(iii) (emphasis added). In addition, Congress provided that the Attorney General could waive the public charge ground of exclusion "in the case of individual aliens for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. § 1255a(d)(2)(B)(i).

As required by the statute, 8 U.S.C. § 1255a(g)(1)(B), and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.,* the INS promulgated regulations to implement IRCA. A Notice of Proposed Rule Making was published in the Federal Register on March 19, 1987, 52 Fed.Reg. 8752 *et seq.* (1987), and final regulations were published on May 1, 1987, 52 Fed.Reg. 16205 *et seq.* (1987), codified at 8 C.F.R. § 245a. These regulations, *inter alia,* defined the criteria used by the INS to evaluate an alien's ability to demonstrate that he would not become a public charge if granted temporary residence.

The IRCA implementing regulation headed "proof of financial responsibility" provided:

> An applicant for adjustment of status under this part is subject to the provisions of section 212(a)(15) of the [INA] ... unless the applicant demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance. Generally, the evidence of employment submitted under paragraph (d)(3)(i) of this section [to establish proof of the requisite period of continuous residence necessary to qualify for legalization under IRCA] will serve to demonstrate the alien's financial responsibility during the documented period(s) of employment. If the alien's period(s) of residence in the United States include significant gaps in employment or if there is reason to believe that the alien may have received public assistance while employed, the alien may be required to provide proof that he or she has not received public cash assistance. An applicant for residence who is likely to become a public charge will be denied adjustment.

8 C.F.R. § 245a.2(d)(4) (1987).

The regulations implementing IRCA's Special Rule (see *supra* at 1041) provided:

> An alien who has a consistent employment history which shows the ability to support himself and his or her family, even though his income may be below the poverty level, may be admissible under paragraph (k)(2) of this section [relating to waivers of grounds of exclusion under 8 U.S.C. § 1255a(d)(2)(B)(i) ]. The alien's employment history ... should be continuous in the sense that the alien shall be regularly attached to the work force, has an income over a substantial period of the applicable time, and has demonstrated the capacity to exist on his

or her income and maintain his or her family without recourse to public cash assistance. This regulation is prospective in that the service shall determine, based on the alien's history, whether he or she is likely to become a public charge. Past acceptance of public cash assistance within a history of consistent employment will enter into this decision. The weight given in considering applicability of the public charge provisions will depend on many factors, but the length of time an applicant has received public cash assistance will constitute a significant factor.

52 Fed.Reg. 16212 (May 1, 1987), codified at 8 C.F.R. § 245a.2(k)(4) (1987). In November 1987, this regulation was amended to eliminate the reference to waivers under paragraph (k)(2). 52 Fed.Reg. 43844 (November 17, 1987).

"Public cash assistance" was defined by the regulations as:

income or needs-based monetary assistance, to include but not limited to supplemental security income, received by the alien or his or her immediate family through federal, state, or local programs designed to meet subsistence levels.

8 C.F.R. § 245a.1(i) (1988).

Just before the amnesty program began, the INS, responding to comments, inquiries, and criticisms of its proposed public charge regulations, emphasized that "applicants *may* in fact be ineligible for legalization if such cash assistance was received by their U.S. citizen children." 52 Fed.Reg. 16207 (May 1, 1987) (emphasis added).

On September 23, 1987, in a memorandum entitled "Guidelines for Determining Public Charge Issues under Legislative Provisions of the Immigration Reform and Control Act of 1986 (IRCA)", the INS promulgated further relevant guidelines:

Proof of financial responsibility under 8 C.F.R. § 245a.2(d)(4) is to be established by examining *the totality of the alien's circumstances* at the time of his or her application for legalization. The existence or absence of a particular factor should never be the sole criteria for de-

termining if an alien is likely to become a public charge. The determination of financial responsibility should be a prospective evaluation based on the alien's age, health, income and vocation.

Pl.Ex. 9 (memorandum dated September 23, 1987, from Richard E. Norton, Associate Commissioner, to Regional Commissioners).

On October 1, 1987, the INS issued a memorandum providing an example of when a waiver of the public charge provision might be available for those not otherwise eligible for qualification under the "Special Rule":

Waivers may be accepted in the case of applicants who have had extenuating circumstances which necessitated reliance on public cash assistance in the past, but for whom the likelihood of relying on public cash assistance in the future appears non-existent.

Pl.Ex. 11 (memorandum entitled "Waivers, Section 212(a)(15)", dated October 1, 1987, from Richard E. Norton, Associate Commissioner of INS to Edward J. Wildblood, Regional Legalization Officer of the Eastern Region).

On November 23, 1987 INS addressed the issue of public cash assistance paid to an applicant's family members in the form of Supplemental Security Income ("SSI") benefits:

For purposes of evaluating proof of financial responsibility under 8 C.F.R. § 245a.2(d)(4), SSI should be considered as public cash assistance only with regard to the person who receives it. SSI should not be attributed as public cash assistance to the immediate family members who reside with the recipient but who themselves are non-recipients.

Pl.Ex. 14 (memorandum dated November 23, 1987, from INS Associate Commissioner Richard E. Norton to INS Regional Commissioners).

On February 12, 1988, Assistant INS Commissioner William S. Slattery, in a letter to John M. Payne, a senior official of the Department of Human Services of the District of Columbia (the "Slattery letter"), addressed the question of whether receipt

of Aid to Families With Dependent Children ("AFDC") benefits would render an applicant ineligible for legalization. He wrote, "Public charge status is not conveyed to the parent-payee *if the United States citizen child is the recipient.*" Pl.Ex. 18 (emphasis added). On February 26, 1988, INS Commissioner Alan C. Nelson wrote to Ruth Massinga and Marlin Johnson of the American Public Welfare Association ("APWA") and repeated the advice that receipt of AFDC benefits by a child would not render a parent ineligible for legalization. Pl.Ex. 20.

## II. *Prior Proceedings in this Action*

Plaintiffs filed their complaint on April 1, 1988, approximately one month prior to the expiration of the deadline for filing amnesty applications. The complaint[2] asserts that INS "adopted and published unlawfully restrictive regulations on the so-called 'public charge' ground of exclusion," Complt. ¶ 4, that "unlawfully classified thousands of economically productive, self-supporting aliens as 'likely to become public charges'—and excluded them from legalization—merely because the aliens' citizen or permanent resident dependents lawfully receive or have received public assistance." Complt. ¶ 6. The complaint further alleges that the "challenged regulations directly contravene the Immigration Reform and Control Act, which expressly provides that an alien must *not* be denied legalization on 'public charge' grounds if she or he can demonstrate the capacity for *self*-support." Complt. ¶ 8 (citing 8 U.S.C. §§ 1255a(a), 1255a(d)(2)(B)(iii)). The complaint goes on to assert that, as early as December 1987, high INS officials took the internal position—contrary to INS's published regulations—that the receipt of public cash assistance by the U.S. citizen children of an undocumented alien is not relevant to the determination of the alien's eligibility for legalization. Complt. ¶ 13. The complaint then makes reference to the aforementioned February 12, 1988, letter of Commissioner Slattery. *Id.* Finally, the complaint alleges that INS's failure to

amend its unlawful "public charge" regulations or otherwise notify the public of the "altered eligibility standards" evidenced by the Slattery letter unfairly deterred large numbers of qualified aliens from filing for legalization. Complt. ¶ 18.

The individual plaintiffs sought to represent a class composed of:

(a) all undocumented aliens residing in New York State who may be excludable from the Legalization Program established by [IRCA] as "likely to become public charges" based in whole or in part upon the receipt of public cash assistance by the applicants' U.S. citizen or legal permanent resident dependents, and (b) all undocumented aliens residing in New York State who either failed to apply for legalization by May 4, 1988, or who abandoned their applications, because they believed that they were ineligible on "public charge" grounds.

Complt. ¶ 28. This class of similarly situated aliens assertedly exceeds five hundred in number. Complt. ¶ 29.

Plaintiffs sought immediate injunctive relief, including judicial extension of the May 4, 1988 filing deadline, the promulgation and publication of clarified regulations on the relevance of AFDC assistance to public charge determination, and the ordering of INS to accept legalization applications from affected aliens for a full twelve-month period following publication of the clarified regulations in the Federal Register.

After several hearings on the matter, the Court, on April 19, 1988, obtained the Government's commitment to publish formally, on a nationwide basis, the substance of the Slattery formulation of the AFDC/public charge issue. We declined on that date to issue the temporary restraining order requested by the plaintiffs. Order dated April 19, 1988.

Two days later, on April 21, 1988, INS Associate Commissioner Norton distributed to all regional offices across the country a detailed and formal memorandum on the effect of the receipt of AFDC benefits on eligibility for legalization. The purpose of

**2.** References are to the First Amended Class Action Complaint, filed on March 15, 1990.

the memorandum was to "reiterate the policy" on the matter. Pl.Ex. 25. It stated as follows:

As a general rule, the receipt of AFDC benefits by a member of the legalization applicant's family is not attributed to the applicant for purposes of determining the likelihood that the applicant will become a public charge.... If, however, the family is reliant on the AFDC benefits as its sole means of support, the legalization applicant may be considered to have received public cash assistance. This determination must be made on a case by case basis and upon consideration of the totality of the applicant's circumstances.

*Id.*

The plaintiffs nonetheless pressed for a preliminary injunction on the ground that the clarification came too late in the amnesty period to benefit those who, but for reliance on the assertedly misleading published regulations, would have sought legalization status. In other words, plaintiffs argued that members of their class, whose United States born children had received AFDC benefits, had self-disqualified themselves on the mistaken belief that such benefits operated to disqualify them automatically as likely to become a public charge, despite the totality of circumstances, the Special Rule and the availability of a waiver.

We denied plaintiffs' application for a preliminary injunction, concluding that "the rights of all the parties can be adequately protected through a systematic and fact oriented trial on the merits, followed by the exercise of the administrative authority of the Commissioner [of INS] and the equitable power of the Court if the record justifies it." Order dated April 26, 1988. In so ruling, the Court invited the plaintiffs to demonstrate that each had constructively filed an application for legalization *prior* to the May 4, 1988 deadline by taking some definitive steps to pursue legalization, but had not formally applied because of misinformation about "public charge" regulations wrongfully given to them by INS. We further invited those who could not show constructive filing to demonstrate a

right to an equitable tolling of the May 4, 1988 deadline based upon Government misconduct. On May 19, 1988 the Court of Appeals affirmed the denial of the preliminary injunction. 847 F.2d 55 (2d Cir.1988).

On May 17, 1988, three pseudonymous individuals filed motions to intervene in this case. Unlike the original individual plaintiffs, these aliens did not file applications before the May 4, 1988 deadline. In June 1988, the same three moved for a preliminary injunction compelling the INS to grant them work authorizations pending the outcome of the case. The motion was withdrawn after INS agreed to provide temporary work authorizations to the three proposed intervenors. On June 28, 1988, plaintiffs moved for partial summary judgment declaring that 1) defendants' "public charge" regulations facially violate IRCA and the Equal Protection component of the 5th Amendment, 2) defendants' failure to disseminate accurate eligibility standards, their shifting interpretations of the public charge standards, and their issuance of misleading and ambiguous regulations violated the Due Process clause of the 5th Amendment and IRCA, and 3) members of the proposed class who can show that they were deterred from applying for amnesty are entitled to equitable tolling of the May 4 deadline. The INS cross-moved for summary judgment dismissing the complaint. Subsequently, plaintiffs moved, pursuant to Fed.R.Civ.P. 23(b), for certification of the class defined in the complaint (see *supra* at 1043). By order dated March 29, 1989 we denied the motions for summary judgment and granted the motions for intervention and class certification.

III. *The Trial*

A. The Alien Witnesses

The plaintiffs called seven alien witnesses, six of whom were class members.

Connie Loe testified that she was born in El Salvador, had lived in the United States for nine years, and had obtained permanent residence status through the amnesty pro-

gram. Tr. 356.[3] She stated that she had heard the amnesty program discussed on radio station WADO and television channel 41 or 47,[4] and went to an organization known as the Concerned Citizens of Queens, a QDE, with her children other than her daughter, Linda Loe, to pursue amnesty. Tr. 357–360. Her daughter Linda did not "attend to her appointments at Concerned Citizens of Queens" because "we had heard that parents whose children had received welfare could not apply for amnesty," Tr. 360, and Linda's U.S. citizen children had received welfare. Connie Loe had heard this, shortly after the amnesty period began, on a WADO radio program, on which a representative of the "Immigration Department" answered phoned-in questions from the public. It was then that she heard this person state that "people whose children were on welfare could not apply for amnesty." Furthermore, this person, who was a woman, said nothing about a waiver. Tr. 361–62. Ms. Loe testified that she telephoned her daughter Linda that day and told her "that possibly she [Linda] could not apply for amnesty because her [Linda's] children were receiving public assistance." At Concerned Citizens of Queens, Connie Loe discussed her daughter Linda's case with "the person who was helping me fill out my application," and "asked him whether my daughter whose children were receiving public assistance could apply and he said no." Tr. 363. She was referred to a lawyer at that point, a Ms. Zambrana, and was told that her daughter could not "apply for amnesty" unless she took her children off welfare. No mention was made of a waiver. Ms. Connie Loe then relayed this information to her daughter Linda. Tr. 364–65.

On cross-examination, Connie Loe stated that references she had seen in the Spanish language newspaper *El Diario* to the receipt of welfare issue did not contain any interviews or statements of government officials. Tr. 371. She further stated that

neither she nor her daughter Linda ever contacted anybody at INS about Linda's eligibility for amnesty. Tr. 373. When asked whether she would have advised her daughter to pursue amnesty if there was a possibility of approval in spite of having children on welfare, Ms. Loe said she would have advised it only if amnesty "had been guaranteed." Tr. 376. The reason for this position, the witness explained, was her fear that her daughter could be deported based upon submitting an amnesty application. She communicated this fear to her daughter, and Linda "was afraid she would be deported if she applied." Tr. 377. The witness did not assert that this egregiously false information,[5] so sadly at odds with the central message of the national amnesty campaign promoted by the Government and the QDEs, came from any Government official or QDE functionary.

Linda Loe, daughter of Connie Loe, testified that she was born in El Salvador and has four children, all of whom were born in New York; that she came to the United States in 1980 and married an American citizen in 1982; that she left her husband in 1984; and that, from that time until May 1988, she was almost always employed. Tr. 384–87. She stated that though her children have received public cash assistance, she herself has never received it. Tr. 388. Ms. Loe further stated that she had heard, on a call-in television program on channel 41 or 47, a male representative of the Immigration Service state that a parent whose children were receiving public assistance could not apply for amnesty. Tr. 391. She stated that she also heard this on radio station WADO, at about the same time. Tr. 392. At this point she asked her mother to inquire about the matter at the Concerned Citizens of Queens. After being advised by her mother of the negative advice from the Concerned Citizens, she went there herself in October or November 1987. Tr. 394–95. The witness stated, "I spoke to the receptionist and asked her to speak

---

**3.** References to the Trial Transcript will be cited as Tr. ——.

**4.** Radio station WADO and television channels 41 and 47 are Spanish-language stations.

**5.** IRCA's confidentiality provision, 8 U.S.C. § 1255a(c)(5), prevents the INS from using the information furnished pursuant to an amnesty application in deportation proceedings.

to the lawyer to see whether I could get some information [and was told] that in order to speak with the lawyer, I had to pay a certain amount in order to get the information." Tr. 395. She did not do so "since I had already obtained the same information from the same place." Tr. 395. At about the same time, she also spoke on the telephone for "about half an hour" with a representative of the City of New York and was told "I could not apply for amnesty, if I had some other way out or some way to apply for papers, okay. But I could not get amnesty." Tr. 396.

On cross-examination, Ms. Loe conceded that she never spoke with anyone at INS about her problem. Tr. 399. She further asserted that in her telephone conversation with the New York City representative she was told that she could be deported based upon her application for amnesty. Tr. 402. Based upon that advice and like information from "family members" and "people sometimes close to [her]," she feared deportation. Tr. 401.

Maria P. testified that she was born in the Dominican Republic, entered the country illegally across the Texas border, has been living in the United States for ten years, has two United States born children, and had been employed for most of the period between her entry into the country and May 1988. Tr. 407–10. She said she had not applied for amnesty "[b]ecause my daughter was receiving public assistance and they were saying that people whose children were receiving public assistance could not apply." Tr. 411. When asked who told her that, she said "The news and people who were talking. At that time a lot of people were talking and I heard a lot of them say that." Id. When her attention was directed to a Mr. Julio Hernandez, the witness stated that in July 1987 she went to his Church and was advised by him "that I couldn't apply [for amnesty] because I had my little girl on public assistance." Tr. 412. He gave her this advice "frequently". Tr. 413. On cross-examination, Maria P. stated that she did not make further inquiry of anyone. Tr. 415–16.

Jenny C. testified that she was born in Colombia, entered the United States illegally through San Diego, has lived here nine years, has one child who was born in New York, and was employed for all but a year of the period since her arrival in the United States. Tr. 422–24. She knew of the amnesty program, but did not apply "[b]ecause I began to hear people saying that all people who were receiving public assistance could not apply." Tr. 424. She stated that in May 1987 she heard a journalist say on Channel 41 that "those persons who had arrived before '82 had a right to apply, but those that had received public assistance did not have a right to apply." Tr. 425. On radio station WADO, she heard another journalist say "something like the fellow said on television, that any person who received public assistance could not apply." Tr. 426. She heard the same thing from an unidentified friend speaking in the street who showed her an INS printed notice, Pl.Ex. 30, which advised *temporary* residents under the IRCA program that, to achieve *permanent* residence, the applicant must not receive certain types of public cash assistance and must not become a public charge. Tr. 427–28. After this conversation with her friend, she did not seek advice from anybody about whether or not she might be eligible for amnesty "because that paper was from immigration so I was sure that I could not apply." Tr. 428. The public assistance benefits she received were Medicaid and Women, Infants and Children ("WIC"), in connection with her pregnancy. Tr. 429. On cross-examination, Jenny C. conceded that she never tried to contact anybody from the government for clarification on her eligibility for amnesty. Tr. 434–35. Nor, although she was aware of the existence of community organizations assisting in the amnesty program, did she seek clarification from those sources. Tr. 435.

Sonia R. testified that she was born in Honduras, has lived in the United States for almost ten years, and has one American born child. She crossed the United States border illegally into Nogales, Arizona. Tr. 442–43. For all but five months up until May 1988, Sonia R. was employed. Tr. 444.

Because she "had already had assistance" —she had received Medicaid and WIC benefits in connection with her pregnancy—she did not apply for amnesty. Tr. 445. She based her decision on a program she heard on Channel 41 "before people applied ... before they started the applications." Tr. 445. The program included, among others, representatives of the "Department of Immigration". Tr. 446. According to Sonia R., a caller stated he or she was receiving assistance and "the person" on the program said that such persons could not apply. Tr. 447. She stated that the only affirmative step she took to pursue her interest in the amnesty program was to go to a law school in Brooklyn, but the record is unclear as to what transpired as a result of this visit. Tr. 447–48. On cross-examination, the witness conceded that she never sought clarification on the issue of receiving public assistance from any government official. Tr. 455.

Rosa C. testified that she was born in Santo Domingo, came into the United States illegally at San Diego, has lived here since 1981, and is the parent of two New York born children. Tr. 457. She has been largely self-supporting, and, although she knew of the amnesty program, she did not apply "because people were saying that people who were receiving assistance for their children could not apply." Tr. 459–60. She heard this on Channel 47 or 41, on which a person from the Immigration Service appeared. "Someone called in and asked whether persons whose children were receiving public assistance would qualify and he [the representative from the Immigration Service] answered no." Tr. 461. No further explanation was given on this topic. Tr. 462. She also heard advice to the same effect on an unspecified radio program. Tr. 462–63. On cross-examination, Ms. C. conceded that she had not spoken to anybody about her amnesty program, even though she knew that various community organizations existed to help people file applications for amnesty. Tr. 466. Nor did she ever contact the INS. Tr. 470.

Miriam B. was born in Trinidad, entered the United States legally on a visa but remained beyond her authorized stay, and is the parent of two children born here. She has been in large measure self-supporting since her arrival in the country. She testified that she did not apply for amnesty because she had seen a television program on Channel 7 on which there were, among others, "people from the Immigration Department.... The program was a panel discussion and they said that persons who received welfare for their children were not eligible.... Everybody [on the program] agreed that that was the case." Tr. 477. Ms. B. later went to a Catholic organization in Englewood, New Jersey and spoke to a nun there. "I asked her if my son received welfare, if I was eligible for the amnesty program, and she told me no." Miriam B. then went to a private lawyer, who told her she could not qualify for amnesty because "her son was on welfare." Tr. 478–82. Finally, Miriam B. spoke to a priest at a Catholic organization in a church in Harlem, and he told her she was ineligible "because my son received welfare." She was also told that "my chances of getting [amnesty] with the waiver was like the same thing, next to nothing." Tr. 483.

### B. INS Witnesses

Terrance O'Reilly testified that, at the time of the amnesty program, he was Deputy Assistant Commissioner for Legalization under IRCA. To advise the public through the radio, television and print media about the standards and benefits of IRCA, INS paid $10.6 million to public relations firms. Tr. 765. It enlisted the support of the American Immigration Lawyers Association, the American Bar Association, a National Coordinating Agency for voluntary groups across the country, and the National QDEs. Press conferences and seminars were routinely held and organized. Tr. 766. Flyers, fact sheets, posters, bill inserts, transit ads, balloons, buttons and radio tapes were produced and distributed on a multi-lingual basis during the amnesty period. Gov. Ex. L. A national toll-free hotline was set up to disseminate application information. Tr. 767.

The QDEs, numbering approximately 1200 nationwide, were created under the statute to act as a buffer between the INS and the alien population, but in fact 75% of all applicants during the amnesty period applied directly to INS rather than through the QDEs or private attorneys. Tr. 767–68. When asked to explain this, Mr. O'Reilly testified:

It is our belief at central office that we tried to have a very fair, very open program. And we felt that if we could get the people to trust us at INS, that we weren't running a big sting operation, that they would come directly to us. Once we started working the people through the process and once people started getting out on the street with the temporary residence cards and went out and showed their buddies that hey, look what I got from INS, it seemed to work real well. People believed us. They believed their friends. So the population started coming directly to us.

Tr. 768. INS opened 107 legalization offices nationwide, and four regional processing centers. Tr. 768–69.

Commissioner O'Reilly testified that it was never INS's policy to consider receipt of public cash assistance by an applicant's immediate family members, citizen family members, as rendering the applicant automatically ineligible for legalization. Tr. 773. He went on to explain that "if there was receipt of any sort of assistance by the citizen child, we viewed that at central office as a tool that should be used to maybe look further at whether or not this alien may be likely to become a public charge [in the future]. More as an indicator that there may be some questions about this person's financial responsibility." Tr. 774. This policy was disseminated by the Service throughout the nation. *Id.*

When asked to review Pl.Ex. 9, the Norton memorandum of September 23, 1987, see *supra* at 1042, Commissioner O'Reilly testified that it did not in any way represent a change in the regulations, but was merely a clarification containing more specific guidance for INS's regional offices. Tr. 774–75. He further indicated that

Pl.Ex. 14, the Norton memorandum of November 23, 1987, see *supra* at 1042, also did not alter, but merely clarified, the regulations. Tr. 776. He testified to the same effect with respect to Pl.Ex. 25, the Norton memorandum of April 21, 1988, see *supra* at 1043–44. Tr. 776. He also asserted that Pl.Ex. 18, the Slattery letter of February 12, 1988 to John M. Payne, see *supra* at 1042–43, reflected no deviation from or modification of the Service's policy regarding the effect of receipt of AFDC funds on legalization. Tr. 780–81.

The legalization program received approximately 1.76 million applications during the one-year entitlement period. The planning assumptions and expectations of INS prior to the opening of the amnesty period was for 2 million applications. Thus, this represented an 88% response rate. In March 1988, the Service announced that, as of April 4, 1988, it would accept skeletal applications *without* documentation and issue immediate work authorizations, to afford all possible applicants an opportunity to meet the May 4 deadline, with an additional 60 days *post*-deadline to assemble and complete the application. Gov. Ex. O. This announcement received broad national media attention and resulted in the filing of 170,000 applications during the last three days of the program. Tr. 786. On cross-examination, Commissioner O'Reilly admitted that Pl.Ex. 18, the Slattery letter, could be interpreted as a change in policy. Nevertheless, the Commissioner maintained that, throughout the amnesty period, the public charge determination was based on the totality of the circumstances. Tr. 801.

Mr. O'Reilly's superior, William Slattery, the Assistant Commissioner for Legalization during the relevant period, had a major administrative role in organizing the Service's national effort to disseminate information and stimulate large numbers of applications. Tr. 820, 822–824. He took sixty-three trips during the one-year application period, including one to the Dominican Republic, during which he did seventeen television shows. He rode an elephant in the Washington, D.C. St. Patrick's Day Parade, and marched in Brooklyn's West Indi-

an Day Parade. In New York, he did "a lot of Irish radio, [interviews with] ethnic newspapers [and three appearances] on Asian T.V. in New York". Tr. 825.

Commissioner Slattery's testimony on the QDEs' role in actually persuading aliens to come forward and file applications is sufficiently instructive to warrant quotation at length:

Q. And could you explain a little bit what your involvement with the QDEs and NCAs was?

A. The QDEs is an abbreviation for Qualified Designated Entities. And this is nomenclature which didn't exist or at least not to my knowledge before the passage of IRCA. It was created in the Immigration Reform and Control Act. Most of the individuals that became known as QDEs were previously either NCAs or volunteer agencies. And they came into existence, my understanding is, based upon representations that they had made that the aliens would not deal directly with the government, that there needed to be an intermediary, a buffer. As a result, they were provided for in the statute.

There was a role provided for them in the statute whereby they would perform that function. They would be an intermediary between the alien population and the INS. So as a result, I had to meet with them because they were going to perform a role whereby they could receive applications from the aliens and then deliver the applications to the INS.

Indeed, at the beginning of the program, they had represented to the INS—I don't know what they represented to the Congress—they certainly represented to the INS that they had millions of aliens already pre-registered for the benefit. So they had already had contact with them. They had already established a way of communicating with them and that they were prepared to bring these people in to INS for the benefit.

It was in my best interest to meet with them since they had the pool of beneficiaries.

Q. Was that representation with respect to millions of applicants ever made directly to you?

A. Yes, yes, absolutely. When I would meet with them initially, I started meeting every week and then later on it was every two weeks, and eventually I think once a month. But the representations of the numbers were made two fold: One, when they met with me, they would talk about the numbers of people they had and two, many of them put a request in for advanced funding. Just as I had to borrow $125 million from the appropriated funds of the Immigration Service to start and to get up to where I could do business, they came to the Immigration Service and they asked for advanced funding.

I don't remember how much money each one asked for, but the largest one was U.S. Catholic Conference. They asked for 1.2 million based upon a dollar per head for everybody they already had registered. So they put a written request in and told us they had 1.2 million people lined up and they wanted that advance. They were to pay it back off when they submitted an application. The QDEs were going to generate about $15 or $16 per application. We were going to deduct one dollar for every application we paid them for until we got the $1.2 million back. That application went to Mr. Duarte.

After a good deal of discussion, they granted Catholic Conference $800,000. They said, "We are not quite sure you have got 1.2 million. Based upon what you are giving us, we will give you $800,000."

Q. Was that Mr. Duarte when you say "they granted"?

A. Yes, and I believe he worked with Mr. Norton on it. I wasn't involved in that grant. $800,000 did go out as start up to Catholic Conference.

THE COURT: How many ultimately did the U.S. Catholic Conference process for the INS?

THE WITNESS: They failed miserably, but I think it was less than 100,000.

THE COURT: What kind of representations were made when the Catholic Conference said it had 1.2 million? What documentation was submitted to support that?

THE WITNESS: I don't know the quality of the documentation or the degree of the documentation, but they represented these individuals were all pre-registered with the Catholic Conference.

THE COURT: A pre-register implies a record of some kind?

THE WITNESS: Yes, I can only tell you that Monsignor de Marzio was head of The Catholic Conference nationwide. And after we advanced this money and the aliens, the numbers didn't come in. By midsummer the media campaign was getting ready to kick in and I had grave concerns that the QDEs were not going to be able to produce that which they had represented they could produce.

If indeed Monsignor de Marzio—just to use him as an example—had 1.2 million people in the pipeline, there was no advantage to me to pay millions of dollars on an alien campaign to see Monsignor de Marzio. He couldn't bring them in the office. Even if he had 3 million people, he couldn't get them in and I had a payroll to meet before the end of the fiscal year.

I decided I had to go to the alien population and tell them to come to the Immigration Service. I told the commissioner that we were going to fail if I didn't reach out to the alien public directly. He gave me the green light; and in the first advertisement campaign that went out, it went out late July of 1987 and it did not mention the QDE participation in the program at all.

We reached right out to the alien community and told them to see us. They started coming in in droves. By August, 1987, Monsignor de Marzio came in and had a meeting with Mr. Norton and he told him I stole all of his clients. I found that a bit unusual because total receipts for the entire country at that time only amounted to 400,000 aliens by August of 1987. So if I stole all of this, I should have at least 1.2 million. That is, if they

were represented by Catholic Conference. He said he was going out of business because I stole his clients and I guess he was right. He did go out of business. They only produced about a hundred thousand for the whole program.

Q. You stated INS provided start-up funds for QDEs. Did Congress require the INS to provide funds to QDEs?

A. I don't believe so, no.

THE COURT: Let me see, I don't want to drop this issue of pre-registration. Are you aware of any records that Catholic Conference or indeed any other QDE created and conceivably might be available in connection with this lawsuit that would demonstrate that persons came forward in the numbers claimed? Did the conference submit with its application for the 1.2 million any documentation as to the persons they had lined up?

THE WITNESS: I never saw the application, Your Honor, because it wasn't submitted to me. It was submitted to Mr. Duarte and I don't know the degree of specificity required to request the funds or if they just took them basically at their word. I never saw the application. I never saw the documentation supporting it. I do know that the request was made for $1.2 million and the service granted $800,000.

THE COURT: Largely on just as you understand it, the oral warranty or promise by this organization that it did indeed have at least 800,000 persons pre-registered implies that they had actually had contact with 800,000 aliens?

THE WITNESS: That is correct. From my own understanding of the situation was when we started out—I believe possibly improperly now—that when they were talking these types of numbers, they had a name and a contact, phone number or address that they had already interviewed somebody and they thought they had an applicant. It turns out that the quality of pre-registration was not quite that high. It might have been somebody saying, "By the way, is there

going to be an amnesty program? If so, I might be interested."

"And how many kids do you have?"

"I have ten." They would chalk off ten pre-registered with no vehicle to ever contact again in the future. I think that is how it turned out. But they never were able to come up with names or anything else. This was an excuse used not just by The Catholic Conference. I don't mean to identify just them. They were the biggest one.

The other QDEs all represented to have people in the pipeline too. And when we would meet, we, the service, as I said earlier, my interests were in bringing enough people in the door especially in the first four months to pay back the money I borrowed. Their interest seemed to lie more in the area of advocacy. They weren't interested in production. They were interested in advocating certain issues.

And so we would meet and I would want to talk about where are the aliens? And they would want to talk about issues. The end result was after jawboning for two or three months, I had to do it myself. I had to push them aside and reach out to the alien community.

THE COURT: You mentioned earlier that Congress had stipulated quite concretely in the statute a role for the QDEs. What in substance was that statutory role?

THE WITNESS: I don't remember the language of the statute right now, but as I understand it, they were to be an intermediary between the aliens and us. There was to be a role for them. I think Congress gave them a role because they wanted a role. They certainly didn't work for me. They weren't an arm of the Immigration Service.

THE COURT: What was the role?

THE WITNESS: Well—

THE COURT: What did you understand the role to be?

THE WITNESS: I understood the role was an end result of an argument put forth by them that the alien community was afraid to deal directly with the Immigration Service, that there had to be a middleman, someone whom the alien community could trust. That was them. They could receive the application from the alien. The alien would not be in contact with an official of the government. And then they could deliver the application to the government, and for that they would get a fee.

THE COURT: So the theory was that the QDE was to in effect collect the application, safeguard it, and forward it to protect that alien's rights?

THE WITNESS: That is correct.

THE COURT: Your view is as this program evolved that isn't principally what they did? They essentially got into policy debates?

THE WITNESS: It was not even essentially. It was from day one. It was advocating policy issues. They looked to the service, for example, through the regulatory process to substitute our judgment for that of the Congress. I can give you all kinds of examples.

THE COURT: That is sufficient.

Tr. 825–33.

Commissioner Slattery further testified:

Q. Were you ever informed that QDEs at any of these meetings that you participated in by representatives of QDEs and NCAs that their field offices were holding applications and not submitting them to the INS?

A. When I met with the QDEs, that seemed to be the message they were giving me at the meetings. And it was for a variety of reasons. In other words, if you would come up and say that ineligible family members can remain in the United States, we can get you applications if you will reduce the documentary requirements necessary to support an application. We get you applications.

So the implied threat was: Change your standards and we will get you the applications. They seemed to be motivated or driven by the fact that they almost wanted a guaranteed pre-approval before they gave you the application. They did not want to risk a denial. Even when the program started running and we

were showing something like a 97 or 98 percent approval rate, they were still hesitant to say they would submit an application until they were pretty much assured of a grant.

Q. Do you recall if the issue of public charge was raised as one of the reasons why the QDEs and NCAs were holding applications?

A. I don't remember, no.

Q. At any time during the meetings that you had with the representatives of the QDEs and NCAs, did you tell them that they should submit the applications that they were holding?

A. Absolutely.

Q. Why was that?

A. One I needed them. I needed a lot of applications. I wanted them to submit everything they had. I was satisfied in the integrity of the program that our goal was to look for a way to grant these cases as opposed to deny them. We intended to be very liberal in our adjudication. I think our end result establishes that position. We had a 90 something percent approval rate. We were just encouraging them and trying to show them that they were imagining more problems than what really existed in the program.

If they submit applications, they will see. We will approve them. Start submitting and we will grant them and they will get a feel as it goes out. They seem to want guarantees beforehand, before they would give us an application.

Tr. 838–40.

John O'Malley, an information officer for INS in New York during the legalization campaign, appeared on Channels 41 and 47 and on other television and radio programs as a spokesperson for the service in its outreach efforts to the alien population in this area. Tr. 658–59. In the course of dealing with the public charge issue at such public or media forums, the witness stated that he would not have asserted that an alien whose United States citizen children were receiving welfare benefits did not qualify for legalization, because to have done so would have been inconsistent with the regulations that he was very fa-

miliar with and with the training he had received. Tr. 672–73. Nor did he ever say that waivers were not available for aliens who were found excludable on the basis of being determined likely to become a public charge. Tr. 674–75. He stated that during the year he made 210 appearances on radio, television and at public meetings.

Richard Berryman, who served as INS's legalization officer for the amnesty program in Hempstead, Long Island during the application period, Tr. 695, conducted a two-week training session for INS personnel in April 1987 on legalization procedures in Burlington, Vermont. Tr. 700–02. He later became INS district coordinator for training. Tr. 704.

He described the process of interviewing an applicant as it might have implicated the public charge ground of exclusion:

Q. Now, with respect to the interview process, would public charge exclusion grounds be one of the topics that was discussed or explored at that interview?

A. Yes, if the person indicated that he had received public cash assistance, it was on the back page of the application. And if he indicated that, the adjudicator would explore that saying, "Did you receive public cash assistance?" Or "In what form was it?" For example, some people thought food stamps were public cash assistance and it was not. Many people thought that. Some applicants thought that certain medical benefits that they had gotten constituted public cash assistance and it did not. So adjudicators would explore any grounds of inadmissibility that the alien checked off. In the course of adjudicating the application, one of the eligibility criteria was financial responsibility. And the alien had to demonstrate that he or she was attached to the work force and did not receive public cash assistance, was able to support him or herself without recourse to public cash assistance. The supporting documentation was examined also to see that the alien had met that burden of proof. For example, if there were a year or certain amount of time after 1982 up until the time of the inter-

view that the alien could not show that he or she was employed or getting income from somewhere, then the adjudicator would generally dwell on that and say, "There is a gap here. How did you support yourself during this period of time?"

We did not require documents for every single month of every single year. We were looking at a total picture of a person. Maybe he worked off the books. Not a proof of payment which was the case in a number of the applications that we saw, then the adjudicator was supposed to make a judgment. What is the totality of the picture here? Was this person able to support him or herself during this period of time?

Q. If an applicant indicated that they had in fact received public assistance over a fixed period of time during the relevant period, would that have automatically rendered them ineligible for legalization?

A. No, we were not allowed to disqualify anybody on that because it wasn't a grounds of statutory denial. If a person was inadmissible under one of the grounds of exclusion that could not be waived, then we would issue a local denial.

In the case you mentioned if it were public charge, we would indicate to the person the availability of a waiver and the necessity of applying for a waiver. And if it were granted, the application could be approved. Could be.

Q. Now, were these recommended denials or grants binding in any way upon the regional processing facility or the RPF?

A. No, the regional processing facility could overturn a local recommendation of grant or denial. So they were not binding in any manner or form, no. May I just expand on that? The regional processing facility was supposed to obtain the results of the fingerprint check that the alien applied for. The regional processing facility was also to get the results of a criminal background check and if there were another INS file in existence for an alien, the regional processing

facility would get that other file and see if that file contained any information that had bearing on the legalization case. We did not have the full picture on the local level. We made our recommendations based on what the alien had indicated on the application, what supporting documentation the alien had submitted, and on the judgment of the adjudicator in applying the applicable statute and regulations. But the RPF also had access to this other material and they would wait for any of that material and make a final decision.

Q. Mr. Berryman, I would like to go back for a second. I believe you indicated that in the case of a specific applicant who had received public cash assistance over a fixed period of time, that that would not result in an automatic finding of ineligibility. Would that have resulted in automatic recommendation for denial by the local office?

A. It would have. Yes, I have to explain that. If a person were inadmissible and a waiver were submitted or if the alien were told that a waiver were submitted, we would check or remedy a file and the adjudicator was told to articulate on the worksheet that the alien was informed that waiver was available, the waiver is attached, or as part of the application, or that the alien was informed that a waiver is available, was given form I-690 and told to mail it to the regional processing facility.

The reason to check denial was to flag down that application because at one stage, they were spot checking all recommended grants. But any recommendation denial was automatically flagged down for further RPF examination and final determination.

Q. Now, I would like for you to distinguish if you can between the circumstance you just described and one in which an alien applicant's United States citizen child received public cash assistance? Would under that second scenario, would that have resulted in automatic recommendation for denial by the local office?

A. No, I think in that instance, the adjudicator would explore how the alien met the burden of proof for financial responsibility. If there were a problem in that, during that time, the alien had to rely on public cash assistance to support himself and his or her family during the time, we would recommend a waiver at that time. This was before the special rule procedures were clarified.

Q. And subsequent to the clarification of the special rule procedures, would there have been any other different result?

A. Yes, if the adjudicator were convinced that the person fell under the provisions of the special rule, we would not require a waiver be submitted, and the adjudicator would so indicate on the worksheet—on the write-up on the worksheet—that the special rule applied. My judgment is that the special rule applies in this case. No waiver requested. Probably he would recommend a grant.

Tr. 710–15.

Mr. Berryman stated that at a training session involving one QDE in July of 1987, *before* the technical amendments of the regulations governing IRCA, he did, as reflected on page five of Pl.Ex. 54, state the following:

> In summary, 245A applicants for temporary residence who have received cash assistance because they were unable to support themselves and/or their families are subject to 212(a)(15). They may apply for a waiver if the waiver criteria apply: family unity, humanitarian considerations and in the public interest. Most of the QDE representatives present indicated that most of their clients who had received welfare did so due to entitlements to their U.S. citizen children. I indicated that these applicants should file a waiver because the family unity issue allowed for this and I saw no reason why such a waiver would not be viewed favorably by the Service.

Tr. 724. He indicated that subsequent to the technical amendments, however, his understanding changed: if the Special Rule applied, no waiver was needed. Tr. 725.

Mr. Berryman further testified that Pl.Ex. 54 was not disseminated to anyone outside INS, and that Pl.Exs. 31 and 60 were never disseminated to the QDEs by the INS. Tr. 727, 737–38. He confirmed that information relating to the public charge question as reflected in the INS training documents marked as Gov. Exs. F and G was in fact disseminated in QDE training sessions held in September 1987. Tr. 728–730. Finally, he stated that QDEs had no adjudicatory role in the process, but were merely to serve as a referral source, and that this was unequivocally communicated to them in the governing contracts (Pl.Ex. 38) and the training sessions. Tr. 735–37.

### C. The QDE Witnesses

The plaintiffs presented the testimony of four QDE representatives: Marco Mason, Haydee Zambrana, Rachel Miller, and Heidi Schoedel. Plaintiffs produced these witnesses to establish that INS had broadly misled or at least confused the QDEs on the public charge issue as it related to AFDC payments to U.S. born children of IRCA applicants. We will not reference this testimony at length, as we found it generally not especially precise, even-handed or persuasive. What their testimony revealed is a striking unwillingness to deal with the language of the controlling regulations, a disposition to find only categorical certainty where qualification and condition obtain, and a reluctance to acknowledge the QDE role in the program as defined by statute, contract and instruction. One cannot, for example, read the testimony of Dr. Marco Mason, the director of the Caribbean Immigration Center, without concluding that his credibility is severely damaged by generalizations, equivocation and ignorance. Furthermore, his organization produced no documentation to support his criticism of the INS procedures. Tr. 109–169.

Haydee Zambrana, who worked at the Concerned Citizens of Queens, testified that she could not recall if she had ever read the final IRCA implementing regulations, and she did not know if she ever read

any regulations after May 4, 1987 or what portion she had read of the version that she did see. Tr. 215–16. With respect to her responsibilities toward the alien applicants whom fate placed in her care, she said that she "rejected" those whose applications raised questions as to the public charge issue. Tr. 218. She dealt with applicants who were employed but whose United States born children were receiving public cash assistance, and she "rejected" them, too. Tr. 219–20. She did not recall if she ever read the Special Rule provision but "assumed" that she had, and could not remember if she referred any questions about the public charge criteria to her organization's supervising attorney. Tr. 220–25. She could not recall reading the waiver provisions either. Tr. 226. She admitted that she was the official of her QDE who signed its agreement with the INS but could not remember if she advised "rejected" aliens of the availability of waivers, despite her organization's obligation under the agreement to do so when advising aliens who were likely to be rejected by the INS on public charge grounds. Tr. 231–32; Pl.Ex. 38 at ¶ 4.7. She also asserted that she could not recall seeing Section 245a(c)(3) of the Act, IRCA's prohibition of adjudication of amnesty claims by QDEs, but after reading it, agreed that it applied to QDEs. Tr. 228–29.

Rachel Miller testified that she worked at two QDEs during the amnesty program, the Chinatown Planning Council and the Traveler's Aid Service, and received training from the INS on the IRCA program. Tr. 332–36. She instructed her staff at the latter organization that the receipt of public cash assistance by an applicant or his family was not a "good sign", and that it would require that an amnesty application be accompanied by a separate waiver application. Tr. 339–40. Traveler's Aid, however, never filed such a waiver request for an applicant whose citizen children were receiving public cash assistance, Tr. 342, and indeed, she was aware of only one applicant in this category, whose case was referred to outside counsel. She was unaware of any such cases coming into the organization on its hotline. Tr. 343.

Heidi Schoedel testified that during the amnesty program she was legalization director for the World Relief Corporation, certified by INS as a National Coordinating Agency. She conceded that whatever ambiguity World Relief found in the AFDC issue was dissipated in March 1988, at least two full months prior to the amnesty deadline, when she learned of the Slattery letter to John Payne. Tr. 602–04.

### D. The Non–QDE Alien Advocates

The Non–QDE immigrant advocates called by the plaintiffs, Darlene Kalke, Julio Hernandez, Margaret McManus, Carmen Olmeda and Irene Leacock, gave a body of testimony that in substance establishes that the organizations represented had little or no direct contact with the INS, read the regulations with varying degrees of acuity and completeness, and gave advice to applicants on the public charge issue based largely upon a generalized understanding of that exclusion ground among those in the immigration advocate community. Reading this testimony, one is struck by the incoherence and disorganization that characterized the formal operations of these organizations. This is most strikingly true on the subject of the waiver, and the amazing indifference to the need for careful recordkeeping.

Darlene Kalke was executive director of the Center for Immigrant Rights during the legalization program. Most unfortunately, this organization seemed to have been wholly oblivious to the potential damage that its pseudo-policies could do to the rights of individual alien applicants, especially because, under IRCA, there was no negative consequence (other than the loss of the filing fee [6]) that could befall an applicant whose amnesty petition was turned down. Ms. Kalke admitted that she held alien applications until the advocates "could change the regulations", and

---

**6.** Congress directed the Attorney General to provide for a schedule of fees to be charged for the filing of applications for amnesty. 8 U.S.C. § 1255a(c)(7)(A). The schedule of fees is codified at 8 C.F.R. § 103.7(b)(1) (Forms I–687 and I–690).

blamed this course upon a Legal Aid attorney remembered only as "Kathleen". Tr. 26–29.

Julio Hernandez of the Northern Manhattan Coalition for Human Rights asserted that he was told by Mr. Byrnes of INS in the fall of 1987 and the spring of 1988 that AFDC benefits to a citizen child of a parent *then* unemployed would disqualify the parent. Tr. 54. Mr. Byrnes testified that he had no recollection of such meetings. Tr. 643–44.

Margaret McManus, of the Volunteers of Legal Services, conceded that throughout the amnesty program, the regulations consistently provided for a "totality of the circumstances" test for determining an alien's proof of financial responsibility, that is, that he or she was not likely to become a public charge. Tr. 93–95; Pl.Exs. 9 and 25. She also conceded that neither of these Norton memoranda contained a *per se* public charge exclusion rule. Tr. 101–03.

Carmen Olmeda, a lawyer, worked at the Housing Workshop in the Bronx as a legal representative during the amnesty program. She testified about a potential applicant whom she discussed with a "dark-skinned" male with a foreign accent at the legalization office of INS. This applicant had a continuous work history but was at the time unemployed for three months and had received two welfare checks on behalf of her citizen children. According to Ms. Olmeda, the "dark-skinned" male said that the applicant "was considered a public charge". Tr. 175–177. We can only observe that this kind of testimony, submitted *by a lawyer* who asserts that she was fully familiar with the full range of IRCA eligibility criteria and regulations, borders on the ludicrous. We are referred to no case file, no case analysis; no date, no identifiable official and no contemporaneous documentation. Obviously, this anecdotal proof, against which the Government cannot defend, is not especially probative and is entitled to very little, if any, weight.

Finally, Irene Leacock, the Executive Director of the Committee for Nicaragua Refugee Aid, testified that she was told by Ms. Zambrana, identified earlier, that alien parents whose citizen children were receiving welfare could not become legalized and that she was advising prospective applicants that they could not qualify for amnesty. Tr. 565–66. Ms. Leacock in turn trained others in her organization and some volunteers from Hostos Community College that illegal aliens with welfare dependent children could not be legalized. She said the same thing in media appearances. Tr. 572.

### E. Local Welfare Official Witnesses

Plaintiffs also offered the testimony of three local welfare officials from the District of Columbia, New York and Texas. It is quite clear that these states, and presumably others, had strong policy disagreements with INS on the public charge issue. These states and the District of Columbia have large illegal alien populations who routinely received, before and after the passage of IRCA, local welfare support. Despite their broad and direct contact with these alien populations, the bureaucracies of these states apparently did little to encourage these potential IRCA beneficiaries to go to INS and work out, on the ad hoc basis—considering the special circumstances, unique conditions, and personal history of each alien—contemplated by the statute and the regulations, the "likely to become a public charge" assessment. Rather, the states spent their energy, and the precious and limited time of the amnesty period, in petitioning INS for general and blanket assurances that welfare benefits available in a home with citizen children would, absolutely and categorically, be excluded from the "likelihood" assessment, even where the parent was unemployed or the AFDC benefits were being used by the parent. It is not surprising, given this dogmatic and, it must be said, simplistic approach, that all three local officials who testified conceded that the Special Rule and waiver provisions of the regulations played little or no role in their interaction with and advice given to the alien populations in their jurisdictions.

Ms. Gayle Smith of the District of Columbia, for example, did not give advice to

her agency's staff on the waiver provisions, even though she had an understanding of those provisions, because her agency was concerned with not discussing the "intricacies" of the legalization process with prospective applicants. Tr. 243–44, 264–66. Indeed, Robert Sharkey, a New York official, testified that the State's Department of Social Services undertook to warn welfare applicants that receipt of AFDC benefits by themselves or by their children might jeopardize their legalization prospects, even though the agency was unsure of the effect of such benefit receipt and wanted a further explanation of those regulations. Tr. 296, 312, 330–31. It is clear that the New York agency resented the INS's reluctance to furnish advisory opinions about the impact on amnesty claims of specific welfare benefits. Tr. 306–10, 313. Diane Stewart, of the Texas Department of Human Services, ridiculed the INS's outreach efforts during the amnesty period, saying all that INS had done was to "put notices on tamale packages and a few other things," Tr. 543, and yet neither she nor her agency recommended to any prospective legalization applicant to go and speak directly with INS because she did not want "to be trying to advise [welfare] recipients." Tr. 539.

IV. *Analysis*

A. Threshold Issues

In its letter of February 21, 1991, the Government has conceded, as it must, that the Court has subject matter jurisdiction over this case. *See McNary v. Haitian Refugee Center,* —— U.S. ——, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991).

The Government argues that the claims of the three original plaintiffs, Doe, Roe and Coe, who filed legalization applications prior to the expiration of the May 4, 1988 deadline, are either moot or non-justiciable because (1) they have been accorded temporary resident status, and (2) on July 12, 1989, the INS amended the IRCA regulations to provide explicitly that public cash assistance received by an alien's immediate family cannot be imputed to the alien for purposes of determining whether or not the

alien is likely to become a public charge. These plaintiffs disagree, asserting that, at the time they apply for adjustment from temporary to permanent resident status, they "will again be subject to scrutiny under whatever public charge policy INS *may* have in effect *at that time*". Complt. ¶¶ 152, 157 and 162 (emphasis added). Although we are strongly inclined to agree with the Government that this claim is highly speculative and that in any case plaintiffs may be required to exhaust their remedies at the INS, we nonetheless decline to so rule in light of our disposition of the case.

■ The Government further asserts that the claims of the plaintiff-intervenors, Foe, Moe, Loe, Soe and Zoe, none of whom have filed legalization applications, are premature and not yet ripe for adjudication. The same argument is made against the broad class they represent. This argument simply makes no sense in light of the nature of the injury complained of here, that is, that these aliens were prevented or dissuaded from filing for amnesty because of assertedly defective and unlawful regulatory and promotional procedures of the INS under the Act. Plaintiffs are entitled to seek redress from this Court by challenging the INS's regulations and procedures, without first having to file an application and be denied amnesty or having to wait for the INS to begin deportation proceedings. *Cf. McNary,* 111 S.Ct. at 898 (requiring aliens denied "Special Agricultural Worker" status to surrender themselves voluntarily in order to obtain judicial review is "tantamount to a complete denial of judicial review").

The last of the Government's threshold arguments is that the state and city plaintiffs lack standing to sue on behalf of their citizens because neither states nor local governments have *parens patriae* standing to sue the Federal Government. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 610 & n. 16, 102 S.Ct. 3260, 3270 & n. 16, 73 L.Ed.2d 995 (1982); *South Carolina v. Katzenbach,* 383 U.S. 301, 324, 86 S.Ct. 803, 816, 15 L.Ed.2d 769 (1966). The Government further argues

that these plaintiffs do not have standing to sue by reason of any alleged injury to themselves, in that they have not shown any actual or threatened injury to New York State or New York City as a consequence of the alleged illegal conduct of INS. While the Government has a strong argument on both grounds, it is unnecessary to decide this issue because the non-governmental plaintiffs have standing. *See United States Department of Labor v. Triplett,* —— U.S. ——, 110 S.Ct. 1428, 1431, 108 L.Ed.2d 701 (1990); *Bowsher v. Synar,* 478 U.S. 714, 721, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986).

### B. The Merits

Our inquiry is threefold: (1) have the plaintiffs established that the INS's public charge regulations are inconsistent with IRCA; (2) have the plaintiffs established that the INS disseminated misinformation concerning its public charge regulations in violation of IRCA and the Due Process clause of the Constitution; and if so, (3) does the Court have the power to grant the relief sought.

### 1. Are INS's Public Charge regulations inconsistent with IRCA?

#### a. Standard of review

■■■ We begin with a classic restatement of the basic principle:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent to Congress. . . . If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on

a permissible construction of the statute. [fn: The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.]

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (citations and one footnote omitted). "If Congress has explicitly left a gap for the agency to fill . . . legislative regulations [promulgated pursuant to the statute] are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44, 104 S.Ct. at 2782 (citations omitted). If the delegation of rule-making authority is implicit rather than explicit, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* (citations omitted).

■■ Section 1255a(g)(1)(B) of IRCA directs the Attorney General to "prescribe . . . such . . . regulations as may be necessary to carry out this section." Additionally, Section 212(a) of the 1952 Act explicitly grants the Attorney General the authority to decide whether, and upon what grounds, an alien is likely to become a public charge. Thus, INS's interpretation of IRCA's "admissible as an immigrant" provision is entitled to a high degree of deference.

We do not think INS's "Special Rule" regulation is entitled to the same deference as the "public charge" regulation. Unlike the "public charge" provision, which clearly gives INS discretion in determining admissibility requirements, the Special Rule provision of IRCA may be read to reflect explicit Congressional intent with little room for flexibility in interpretation on the part of INS. The Rule provides that, "if the alien demonstrates a history of employment in the United States evidencing *self-support* without receipt of public cash assistance", he is eligible for adjustment of status. 8 U.S.C. § 1255a(d)(2)(B)(iii) (emphasis added). INS's "Special Rule" regu-

lation, 8 C.F.R. § 245a.2(k)(4), however, incorporates INS's definition of "public cash assistance" as any "needs-based monetary assistance ... received by the alien or *his or her family members.*" 8 C.F.R. 245a.1(i) (emphasis added). Coupled with Congress's clear intent that IRCA be implemented in a liberal and generous fashion,[7] plaintiffs' contention that INS's "Special Rule" regulation is too restrictive is not insubstantial.

■ Moreover, as we have noted, INS has announced certain clarifications of its interpretation of IRCA's "public charge" and "Special Rule" provisions since its implementing regulations were first issued. "An agency's interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza-Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)). *See also Barnett v. Weinberger,* 818 F.2d 953, 960–61 & n. 74 (D.C.Cir.1987) ("prestige of a statutory construction" by agency depends crucially upon whether it was promulgated contemporaneously with enactment of statute and has been adhered to consistently over time); *Jordan v. Lyng,* 659 F.Supp. 1403, 1416 (E.D.Va.1987) (fact that agency's statutory interpretation has been neither consistent nor longstanding substantially diminishes deference to which it is entitled in interpretation of statute); *Oregon Dep't of Human Resources v. Heckler,* 651 F.Supp. 6, 9 (D.C.Or.1984) (district court would not defer to agency's interpretation of statute where agency had interpreted statute inconsistently in the past).

b. The regulations

All that being said, the relevant regulations as a whole consistently provided that

any legalization applicant whose U.S. citizen children received public cash assistance at any time on or after January 1, 1982 *might* be excludable from the legalization program as a public charge or likely to become a public charge, but that a determination of excludability had to be based on all of the alien's circumstances. The determination depended on such factors as whether the aid to the child was the alien's family's *sole* means of support and the length of time the alien's family had received assistance. *See* 8 C.F.R. § 245a.2(k)(4); Pl.Exs. 9, 18, 25 (identified *supra* at 11–12, 13, 15–16). If the assistance to the citizen child was entirely attributable to the alien parent, the alien could be excluded as likely to become a public charge. In such cases, the regulations provided for, *see* 8 C.F.R. § 245a.2(k)(2), and INS officials administering the legalization program encouraged, the liberal grant of waivers.

According to the plaintiffs, the "public charge" regulations *require* an applicant to demonstrate both a history of employment in the United States evidencing self-support and that none of *his or her family members* have received public cash assistance. We disagree. The "proof of financial responsibility" regulation provides that

[a]n applicant for adjustment of status under this part is subject to the provisions of section 212(a)(15) of the Act relating to excludability of aliens likely to become public charges unless the applicant demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance.

8 C.F.R. § 245a.2(d)(4). "Public cash assistance" is defined as assistance "received by the alien or his or her family members." 8 C.F.R. § 245a.1(i). Read in isolation, this

---

7. Congress intended the legalization program to be "implement[ed] in a liberal and generous fashion." H.R.Rep. No. 682 (Part I), 99th Cong., 2d Sess. 72, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5649, 5676 (hereinafter, "House Report"). Congress also "expect[ed] the INS to incorporate flexibility into the standards for legalization eligibility." House Report at 73. *See*

*also* 130 Cong.Rec. H5908 (daily ed. June 15, 1984) (statement of Rep. Brown) (purpose of Special Rule for public charge determination was "to incorporate in the language of the bill a provision which demonstrates *more flexibility than we have historically had in connection with the application of the immigration law*") (emphasis added).

"proof of financial responsibility" may be interpreted as disqualifying any alien whose child has received welfare benefits.

■ Read in conjunction with the "Special Rule" regulation, however, the "public charge" regulations are not written in absolute terms; they do not *require* an applicant to demonstrate that his or her citizen children have never received public cash assistance. The "Special Rule" regulation, 8 C.F.R. § 245a.2(k)(4), is an explanation of factors, including the continuity of the alien's employment history and the length of time the alien has received public cash assistance, which were to be taken into account in determining whether an alien could be admitted despite the initial determination under 8 C.F.R. § 245a.2(d)(4) that the alien was inadmissible on the public charge ground. Thus, even before the November 1987 modifications of the public charge regulations, aliens with welfare dependent children did not *automatically* fall outside the Special Rule, the regulation implementing which stated only that "[p]ast acceptance of public cash assistance within a history of consistent employment" would be a factor in the analysis of INS, as would the duration of such assistance. 52 Fed. Reg. 16212 (May 1, 1987) (earlier version of 8 C.F.R. § 245a.2(k)(4)). While this regulation is poorly drafted, nowhere does it suggest that the receipt of public cash assistance, by the applicant himself, much less his immediate family, constituted a *per se* bar to an applicant's qualifying for amnesty under the Special Rule.

■ It is not surprising, then, that INS is on record as having said "the statute is clear regarding this subject and applicants *may* in fact be ineligible for legalization *if [public cash assistance] was received by their U.S. citizen child.*" 52 Fed.Reg. 16207 (May 1, 1987). Although this formulation could have been clearer, and was indeed later clarified, we read it as implying that public cash assistance received in a formal sense by the child but used by the parent to support himself could be germane on the question of whether the applicant "evidenc[es] self-support without receipt of public cash assistance." This formulation comports with pre-IRCA applications of the "public charge" ground of ex-

clusion. *See Matter of Perez,* 15 I. & N. Dec. 136, 137 (B.I.A.1974) ("the fact that an alien has been on welfare does not, by itself, establish that he or she is likely to become a public charge").

There is no doubt that INS had the discretion to include aid received *indirectly by the applicant* through family members, such as AFDC funds, in the mix of factors and circumstances bearing upon an applicant's likelihood of becoming a public charge. First, when Congress enacted the public charge basis of exclusion into law, it declared:

> Since the elements constituting likelihood of becoming a public charge are varied, there should be no attempt to define the term in the law, but rather to establish the specific qualification that the determination of whether an alien falls into that category rests within the discretion of the consular officers or the Commissioner [of Immigration].

S.Rep. No. 1515, 81st Cong., 2d Sess. 349 (1950) (quoted in *Matter of Harutunian,* 14 I. & N. Dec. 583, 588 (B.I.A.1974)). Thus, Congress has consistently recognized that bright-line, absolute rules are inappropriate in public charge determinations. Second, illegal aliens are ineligible for AFDC, SSI or New York State Home Relief benefits. *See* 42 U.S.C. §§ 602(a)(33) and 1382c(a)(1)(B); N.Y.Soc.Serv. Law § 131–k; 45 C.F.R. § 233.50. Thus, illegal aliens generally receive public cash assistance only through their U.S. citizen children, unless they are receiving benefits fraudulently.

Indeed, the very purpose of the AFDC program is to encourage the care of indigent dependent children in their own homes or in the homes of relatives by enabling states "to furnish financial assistance ... and other services ... to needy dependent children *and the parents or relatives with whom they are living.*" 42 U.S.C. § 601 (emphasis added). It was therefore entirely proper for INS to examine an alien's dependent family unit as a whole, rather than merely the alien's financial circumstances in a vacuum, and take into account those circumstances where an applicant was indirectly receiving welfare support through his or her children, in making the

determination of whether or not the applicant was likely to become a public charge.

We find that the central INS documents in this lawsuit, the memoranda, dated September 23 and November 23, 1987 and April 21, 1988, issued by Associate Commissioner Richard E. Norton, Pl.Exs. 9, 14 & 25 (see *supra* at 1042 & 1043–1044), clarified the role in the public charge analysis played by AFDC benefits to U.S. citizen children, but did not change the basic and fundamental procedural rights conferred upon IRCA applicants by the regulations and the statute that authorized the promulgation of those regulations. Even if one is to read the April 21, 1988 memorandum as announcing a more liberal and accommodating policy of the INS on the AFDC issue, we note that two weeks remained before the expiration of the filing deadline for those in the plaintiff class to take advantage of whatever expansive reading one wishes to give to the final statement of Commissioner Norton on the subject.

By no later than November 17, 1987, the INS had broadly communicated to the alien population at large that the statute and the regulations authorized a legalization applicant three separate opportunities to address a "public charge" ground of exclusion: a formal determination of whether a likelihood of becoming a public charge existed; application of the "Special Rule" to

determine, notwithstanding an applicant's apparent excludability, whether the alien had demonstrated a history of self-support through employment; and the granting of waivers in suitable cases even though a public charge exclusion was warranted.

■ Accordingly, INS's regulatory framework, which defined "public cash assistance" as encompassing aid received by amnesty applicants either directly or indirectly through their family members, was a permissible exercise of the authority vested in the Attorney General and the INS by the controlling legislation. INS's consideration of citizen children's AFDC assistance in connection with an alien's IRCA application did not violate IRCA.[8] Thus, we find that INS's public charge regulations were not arbitrary or capricious, and should be given proper legislative effect. *See Bowen v. Yuckert,* 482 U.S. 137, 145, 107 S.Ct. 2287, 2293, 96 L.Ed.2d 119 (1987); *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2782. We further find as a matter of fact and law that they are not inconsistent with or violative of IRCA nor facially unconstitutional.[9]

2. Has the INS disseminated misinformation concerning its public charge regulations, in violation of IRCA and the Due Process clause of the Constitution?

Having determined that INS's public charge regulations and policies were in all

---

8. The fact that the Service amended its public charge regulations after the close of the filing period is of no import. In connection with the implementation of the second phase of the amnesty program, the adjustment of status from temporary to permanent resident, the definition of "public cash assistance" was modified to delete the phrase "or his or her immediate family." 54 Fed.Regs. 29442, 29443, 29448 (codified at 8 C.F.R. § 245a.1(i) (1990)). Similarly, the Special Rule regulation was amended to delete the phrases "and his or her family" from its first sentence and "and maintain his or her family" from its third sentence. 54 Fed.Regs. 29444, 29449 (1989) (codified at 8 C.F.R. § 245a.2(k)(4) (1990)). The Service explained at the time of the amendments that the modifications were done to make it clearer that the regulations were in line with its policies. 54 Fed.Reg. 29442 (1989). Moreover, because the public charge exclusion ground can be waived in the second phase of IRCA only for those individuals defined as aged, blind or disabled under the SSI

program, *see* 54 Fed.Reg. 29453 (1989) (codified at 8 C.F.R. § 245a.3(g)(3)(ii) (1990)); 42 U.S.C. § 1382c(a)(1), the INS obviously thought it appropriate to eliminate any consideration of family members' aid at that second, and different, stage of legalization.

9. Plaintiffs contend that the distinction between childless aliens who earned just enough to support themselves and alien parents who earned just enough to support themselves but whose children were supported by public assistance violated the Equal Protection clause of the Fifth Amendment. *See* Plaintiff's Trial Memorandum of Law at 11–12. Given Congress's plenary authority over aliens and naturalization, U.S. Const. Art. I, § 8, cl. 4; *see Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), plaintiffs cannot seriously dispute Congress's power to deny admission to the U.S. based on the receipt, by an alien or her child, of public cash assistance.

respects lawful, we turn to the issue of whether they were properly disseminated. Plaintiffs contend that confusion surrounding the "public charge" standard in the last few months of the program reflects the Government's failure to broadly disseminate eligibility requirements to undocumented aliens, in violation of IRCA and the Due Process clause.

IRCA emphasizes the need for broad dissemination of eligibility requirements. The legislative history of the legalization program reflects Congress's awareness that undocumented aliens would have great difficulty in learning of and understanding the legalization program because of their isolation from mainstream society and their mistrust of the Government. *See* House Report at 73, 1986 U.S.Code Cong. & Admin.News 5677 ("legalization programs in other countries have usually produced a low rate of participation because of distrust of authority and *lack of understanding among the undocumented population*"). To ensure that the program would be effective, Congress *mandated* that information explaining the program's eligibility requirements be "broadly disseminated," 8 U.S.C. § 1255a(i), and contemplated an extensive education and outreach program. House Report at 73.

The Fifth Amendment of the Constitution commands the federal government: "No person shall ... be deprived of life, liberty, or property, without due process of law...." When a statute or rule creates a right or entitlement, that entitlement is "property" subject to the procedural protections of the Due Process clause. *Goss v. Lopez*, 419 U.S. 565, 572–73, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975). If due process attaches, a deprivation of property must "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). "'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33

L.Ed.2d 484 (1972)). Determining what process is due requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* 424 U.S. at 335, 96 S.Ct. at 903. Thus, for example, whereas recipients of welfare benefits are entitled to an evidentiary hearing before the government may terminate their benefits, *Goldberg v. Kelly*, 397 U.S. 254, 266, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970), recipients of disability benefits, whose "need is likely to be less than that of a welfare recipient," are not entitled to pretermination hearings. *Mathews v. Eldridge*, 424 U.S. at 349, 96 S.Ct. at 909.

Although most cases dealing with benefits address the question of what process is due when benefits are terminated, at least one court has determined that due process requires adequate notice of newly-created welfare benefits. In *Grueschow v. Harris*, 492 F.Supp. 419 (D.S.D.), *aff'd on other grounds*, 633 F.2d 1264 (8th Cir.1980), the court pointed out that

> a newly-created benefit which fails to inform a large number of the potential recipients of their eligibility deprives those people of their rights to the benefits just as surely as if they had once obtained the money, only to have the state falsely claim that they were not eligible and that it must be returned.

*Id.* at 424. The court held that potential recipients of newly-created benefits must receive accurate, clear, and timely notice of the rules and standards for receiving such benefits. *Id.*

Relying on *Grueschow*, plaintiffs argue that they were entitled, under the Fifth Amendment, to clear, accurate and timely notice of INS's public charge regulations.

*See also Perez–Funez v. District Director, INS,* 619 F.Supp. 656, 663 (C.D.Cal.1985) (due process rights of unaccompanied minor aliens were violated where INS officials failed to advise aliens, before having them sign voluntary departure forms, of their right to a deportation hearing); *Orantes–Hernandez v. Smith,* 541 F.Supp. 351, 376 (C.D.Cal 1982) (principles of due process and fundamental fairness required the INS to advise Salvadoran aliens of their right to apply for political asylum before requesting them to depart voluntarily). Furthermore, the Government may be required to make greater efforts at disseminating rules and standards when those affected by the rules are particularly inexperienced or incompetent. *See Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 799, 103 S.Ct. 2706, 2716, 77 L.Ed.2d 180 (1983).

Relying on *Olegario v. United States,* 629 F.2d 204 (2d Cir.1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981), the Government argues that plaintiffs do not have a legitimate claim of entitlement to citizenship under IRCA, and, consequently, that their legal claims are not subject to procedural due process analysis. *Olegario* involved a 1942 amendment to the Nationality Act of 1940. The amendment provided for the naturalization of non-citizens who served in the U.S. armed forces during World War II. The amendment exempted eligible persons from certain pre-existing statutory naturalization requirements, provided for their overseas naturalization, and *authorized* the INS commissioner, "with the *approval* of the Attorney General", *id.* at 208, to pro-

vide application forms and to "make such rules and regulations as were necessary to implement the Act." Pursuant to that authorization, a government official was stationed in the Philippines at the end of the war to naturalize eligible aliens. But in response to Filipino fears that the program would cause a mass exodus of Filipino men, the naturalization official was withdrawn from the country after only two months. No INS official was in the Philippines from October 1945 to July 1946. Technically the program continued but, as a practical matter, Filipinos could no longer apply. A new official was stationed in the Philippines in August of 1946 but the entire 1940 Act expired four months later.

Because the Act did not grant eligible persons "a vested right to citizenship" but merely "liberalized the requirements and established a mechanism ... to enable soldiers overseas to apply for naturalization," 629 F.2d at 223, the Court of Appeals held that traditional due process analysis did not apply. The court went on to analyze the claim "simply as a statutory interpretation question inquiring whether the executive's actions clearly contravened a congressional mandate." *Id.* at 224. Because the decision to provide or withdraw the naturalization official was subject to the Attorney General's approval, the Court concluded that the Government acted within its discretion in withdrawing the naturalization official from the Philippines. *Id.* at 228.[10]

IRCA is distinguishable from the 1940 Nationality Act because IRCA *requires* the INS to broadly disseminate eligibility standards and to grant legal status to eligible applicants. In contrast, the 1940 Act pro-

10. In *INS v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), discussed *infra* at 1065–1067, in which the Supreme Court reviewed a Ninth Circuit decision concerning the Filipino war veterans, the Court "assum[ed] that [the veterans] can properly invoke the protections of the United States Constitution, and grant[ed] that [the veterans] are members of a special class that Congress intended to favor with statutory entitlements to naturalization." *Id.* at 883–84, 108 S.Ct. at 2216. Nevertheless, the Court agreed with the Second Circuit's conclusion in *Olegario* that the war veterans had not been deprived of their rights under the Due Process clause of the Fifth Amendment. *Id.* at

884–85, 108 S.Ct. at 2216–17. The Court observed that, unlike non-citizen servicemen in other parts of the world, the Filipinos had the benefit of the presence of a naturalization officer in the Philippines from August 1945 to October of that year, and from August to December 1946. If INS was not obligated to station naturalization officials in other parts of the world at all, and nothing in the 1940 Act indicates that it was, then it was certainly not obligated to station an officer in the Philippines throughout the naturalization program. Thus, the Court rejected the argument that the withdrawal of the naturalization officer from the Philippines deprived respondents of their Due Process rights.

vided eligible Filipinos with, at best, an "opportunity" to become citizens, and left the decision to post a naturalization officer in the Philippines to the Government's discretion. Indeed, the Court in *Olegario* distinguished the 1940 Nationality Act from statutes that *mandate* benefits and thus create an interest protected by due process. *See, e.g., Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (when parole statute mandates release, it creates a liberty interest subject to due process).

IRCA is such a statute that mandates benefits and creates an interest protected due process. IRCA provides that the INS "shall" grant legalized status to aliens who meet the eligibility criteria and "shall" broadly disseminate eligibility requirements. We conclude that Congress's use of the word "shall" in IRCA, making statutory actions mandatory, gives rise to statutory entitlements to amnesty which are subject to due process protection. *See Allen,* 482 U.S. at 376–77, 107 S.Ct. at 2419–20.

It is, however, not necessary to analyze and discuss, separately from IRCA's specific dissemination requirements, what process is due under the Fifth Amendment. The express statutory requirement in IRCA, that the INS "broadly disseminate information respecting the benefits which aliens may receive under this section and the requirements to obtain such benefits," 8 U.S.C. § 1255a(i), is at least as broad as, if not more stringent than, the requirements of due process. Thus, if the INS's dissemination efforts pass muster under IRCA, they meet plaintiffs' due process concerns.

■ We find that the substance and scope of INS's outreach, education, and public awareness efforts broadly complied with its obligations under the Act and the Constitution to inform undocumented aliens of their rights under IRCA. The INS designed and carried out a comprehensive public awareness and media campaign specifically targeted at the alien population. Gov. Exs. A–C, E, K–L, N, P–T. It routinely advised QDEs of its policies and

procedures, including the availability of waivers, to make the amnesty program succeed, Gov. Exs. G–I, M at 0100, and its cooperative agreements contractually bound the QDEs to disseminate waiver information to amnesty applicants, Pl.Exs. 37 at 6, 38 at 8.

We further find that INS did not instruct those attending its training sessions that aliens with citizen children on welfare were ipso facto barred from legalization. For example, Berryman's July 1987 memorandum, Pl.Ex. 54, which was prepared before the technical amendments to the regulations made it unambiguous that separate waiver applications were not required from those who could otherwise qualify under the Special Rule, indicated that there was "no reason" why INS would not act favorably on waiver applications filed by aliens with welfare dependent citizen children. *Id.* at 5.

■ In essence, plaintiffs argue that confusion in the alien population as to public charge regulations demonstrates that the INS failed to disseminate its public charge regulations. Plaintiffs allege that there was a widespread belief among aliens that the INS was applying a *per se* rule, excluding all aliens whose citizen children had received public assistance. We find that plaintiffs have failed to carry their burden of proof in this regard. Furthermore, the most persuasive evidence to rebut this allegation, that the INS was not broadly communicating its message to the alien community that welfare receipt by an alien's child was not in practical and ultimate terms a bar to legalization, is INS's de facto adjudication of actual amnesty applications. A substantial representative sample of legalization applications filed in New York State effectively demonstrates that throughout the filing period the INS approved the great majority of applications not only of aliens with citizen children receiving public cash assistance, but also of aliens who were *themselves* on welfare. Gov. Exs. EE, FF. In most cases, the aliens themselves were not even required to file separate waiver applications.

This evidence contradicts the plaintiffs' principal argument that the alien population was confused and misled by the INS regulations on public charge policy. It demonstrates that aliens in the assertedly injured class were coming forward and being approved in spite of potential "public charge" problems. Indeed, this may explain why, although we were initially advised that the plaintiff class herein numbered in the thousands, so few class witnesses were presented at trial. Word of these approvals, passing rapidly through the family and associational connections of the alien population, galvanized it to go directly to the INS for the benefit, *see* Tr. 768 (testimony of Commissioner O'Reilly, quoted *supra* at 1048); Tr. 829 (testimony of Commissioner Slattery, quoted *supra* at 1050), debates on regulation nuances among the lawyers, advocates, and government bureaucrats notwithstanding.

We are further persuaded, upon careful consideration of the testimony of INS officials Byrnes, O'Malley, Berryman and O'Reilly, that there never was any *per se* rule with respect to receipt of public assistance by an applicant's children to the effect that it would automatically disqualify on public charge grounds an applicant without regard to the Special Rule or waiver; that INS instruction and training of its own personnel and QDE personnel was consistent with that policy; and that the public position of INS personnel on the public charge question did not misrepresent that policy.

The testimony to the contrary by alien witnesses was generalized, amorphous, and remarkably redundant on the crucial point, with little reference to or memory of context in which the alleged misleading radio and television statements were made. There was, we are sad to observe, something of a drill in their cadenced invocation of the decisive words.

We decline to give any significant weight to the testimony of Irene Leacock, who asserted that, in a legalization conference conducted by her organization, the Nicaraguan Committee, in the spring of 1988, Mr. O'Malley or his colleague stated categorically that legalization could not be obtained by parents whose children had or were receiving public assistance. We further find that any confusion that may have attended Mr. Berryman's expressions on the matter were de minimis, and in any case ceased when the Special Rule regulation was amended.

In sum, we find that the administration and implementation by the INS of the amnesty program, as it related to the public charge ground of exclusion, complied in all respects with the requirements of the Act and did not contravene the Due Process requirements of the Constitution.

3. **Does the Court have the power to grant the relief sought?**

Even if the plaintiffs had prevailed on the merits, we do not believe, based upon this record, that the Court has the authority to compel INS to accept applications after the May 4, 1988 expiration of the amnesty period. The appropriate starting point in addressing this issue is *INS v. Pangilinan*, 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988).

*Pangilinan* is in all likelihood the last chapter in the Filipino war veteran cases. The respondents were sixteen Filipino nationals who served with the U.S. armed forces during World War II. Fourteen of the respondents were in the Philippines before the 1946 cutoff date but took no action toward being naturalized. One of the respondents made inquiries at the American embassy in July 1946 but was told that there was no one there who could assist him. Decades later each of the respondents filed petitions for naturalization in federal court in California based on the 1940 Act, which had expired in 1946. The district court denied the petitions but the Ninth Circuit reversed, holding that the withdrawal of the naturalization officer from the Philippines violated what it called the mandatory language of the 1940 Act and that naturalization of the respondents was an appropriate equitable remedy. *Pangilinan v. INS*, 796 F.2d 1091 (9th Cir.

1986).[11]

In reversing the Ninth Circuit, the Supreme Court first observed that the Constitution grants Congress the express authority to establish rules of naturalization. *Pangilinan*, 108 S.Ct. at 2215. The legislation at issue in *Pangilinan* established a *fixed, immutable* cutoff date of December 31, 1946 for the filing of naturalization petitions. Furthermore, Congress adopted a new citizenship program in 1948 which excluded Filipino servicemen and specifically provided that *timely* applications under the 1940 Act which were still pending would be reviewed under the 1948 provisions. Finally, in 1961, Congress amended the 1952 Nationality Act, specifying that any petition thereafter filed would be reviewed under the 1952 Act. *Id.* Thus, the respondents were confronted with an expired deadline in the Act under which they sought benefits, as well as the mandate of two subsequent pieces of legislation. Accordingly, the Court concluded that "respondents have no statutory right to citizenship." *Id.*

*Pangilinan* was the third Ninth Circuit decision on the Filipino war veteran program that came before the Court. The Court noted that in the first such case, *INS v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam), it concluded that the challenged actions of INS did not give rise to an estoppel against the government because INS " 'in enforcing the cutoff date established by Congress ... [was] enforcing the public policy established by Congress.' " *Pangilinan*, 108 S.Ct. at 2215 (quoting *Hibi*, 414 U.S. at 8, 94 S.Ct. at 21).[12] Although the Ninth Circuit recast its theory in *Pangilinan*, "not that estoppel eliminates the effectiveness of the December 31, 1946, cutoff, but that equitable authority to craft a remedy enables the conferral of citizenship despite the cutoff", 108 S.Ct. at 2215, the Supreme Court's conclusion was the same: such theories cannot override a public policy established by Congress. *Id.*

The Court emphasized that district courts do not have equitable power to confer citizenship. " 'An alien who seeks political rights as a member of this nation can rightfully obtain them only upon terms and conditions specified by Congress.' " *Pangilinan*, 108 S.Ct. at 2216 (quoting *United States v. Ginsberg*, 243 U.S. 472, 474, 37 S.Ct. 422, 425, 61 L.Ed. 853 (1917)). " 'Once it has been determined that a person does not qualify for citizenship ... the district court has no discretion to ignore the defect and grant citizenship.' " *Id.* (quoting *Fedorenko v. United States*, 449 U.S. 490, 517, 101 S.Ct. 737, 752–53, 66 L.Ed.2d 686 (1981)). Thus, "[n]either by application of the doctrine of estoppel, nor by equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations." *Id.*

Relying in part on *League of United Latin American Citizens v. INS*, No. 87–4757–WDK (C.D.Cal. August 12, 1988) (*LULAC*), in which the court ordered the INS to receive amnesty applications for an additional six-month period,[13] plaintiffs argue that *Pangilinan* is distinguishable from this action because (1) INS was violating, rather than enforcing, the public policy established by Congress, (2) IRCA merely creates a twelve-month period of amnesty, rather than an immutable cut-off date, and (3) plaintiffs here seek merely to file appli-

---

**11.** The Court ordered that respondents be naturalized, not simply that they be given an opportunity to petition for naturalization.

**12.** Though not mentioned in *Pangilinan,* the Court in *Hibi* also concluded that INS's failure to fully publicize the rights accorded under the 1940 Act or its failure to station a naturalization officer in the Philippines during the full period those rights were available did not amount to the kind of "affirmative misconduct" necessary to invoke estoppel against the government. *Hibi,* 414 U.S. at 8–9, 94 S.Ct. at 21–22.

**13.** The court found that the INS, in dissuading the plaintiffs from applying for amnesty during at least part of the twelve-month period, in effect deprived the plaintiffs of the full twelve-month statutorily mandated application period. Slip op. at 6. Accordingly, the *LULAC* court determined that it had the power to order INS to accept applications for an additional six-month period, to compensate the plaintiffs for the application time they lost because of INS's actions. *Id.* at 9.

cations, rather than be granted citizenship. *See LULAC,* slip op. at 7–8. Plaintiffs therefore assert that the Court is not precluded by *Pangilinan* from compelling the INS to accept IRCA applications after the May 4, 1988 deadline.

■ We disagree. The Congress, as we have noted, explicitly established May 8, 1988 as the cut-off date for filing applications for amnesty, and reaffirmed that determination in April 1988, by refusing to extend the deadline. 134 Cong.Rec. S5041–43 (daily ed. April 28, 1988). In refusing to accept applications beyond that deadline, INS is enforcing the public policy established by Congress. Because no application filed after the May 8, 1988 deadline is "timely filed", an essential qualification for amnesty under IRCA, aliens who did not file applications before May 8, 1988 are statutorily ineligible for amnesty. Under the analysis of *Pangilinan,* we may not compel INS to accept applications for amnesty after May 8, 1988.

■ Even if *Pangilinan* were not controlling, we do not believe that we could or would exercise our equitable powers in favor of the plaintiffs because there has been no showing of affirmative misconduct by the Government in its administration of the legalization program under IRCA.

In determining whether or not equitable tolling [14] of the filing deadline is appropriate, we must consider whether equitable tolling is consistent with congressional intent and called for by the facts of the case. *Bowen v. City of New York,* 476 U.S. 467, 479–80, 106 S.Ct. 2022, 2029–30, 90 L.Ed.2d 462 (1986). In *City of New York,* the Court noted that the statute in question, involving disability benefits, was designed to be unusually protective of claimants rights and also permitted the agency to toll the 60 day statutory period for appeal in individual cases for a variety of equitable reasons. The Court also observed that plaintiffs only discovered the full extent of the agency's wrongful conduct after expiration of 60 day appeal period. *Id.* at 480,

106 S.Ct. at 2030. In addition, although the Court did not expressly mention "affirmative misconduct" as a prerequisite to equitable tolling, the conduct at issue was so characterized. The Court quoted with approval the circuit court's description of the government's conduct as secretive, and the Court implied that the agency was not faithfully executing its duties. *Id.* at 480–81, 106 S.Ct. at 2030.

■ Moreover, the Court was applying "traditional equitable tolling principles," *id.* at 479, 106 S.Ct. at 2029 (citing *Honda v. Clark,* 386 U.S. 484, 501, 87 S.Ct. 1188, 1197, 18 L.Ed.2d 244 (1967)), under which affirmative misconduct is required. *See LULAC,* slip op. at 4–5. Thus, equitable tolling in cases involving the exercise of administrative power has largely been limited by the Supreme Court to those situations where the record shows that the Government engaged in clandestine or otherwise misleading conduct that deprives a claimant of the opportunity to exercise his or her rights. *Bowen v. City of New York,* 476 U.S. at 480–81, 106 S.Ct. at 2030 (1986); *see also New York v. Sullivan,* 906 F.2d 910, 917 (2d Cir.1990) (tolling appropriate where "government misconduct" kept plaintiffs from appreciating scope of rights); *Wong v. Bowen,* 854 F.2d 630, 631 (2d Cir.1988) (equitable tolling appropriate only where government has hindered claimant's attempts to exercise her rights by acting in a misleading or clandestine way).

Here, equitable tolling is not consistent with congressional intent nor called for by the facts of the case. As we have noted, Congress has strongly opposed extension of the deadline. In addition, the record demonstrates not a hidden and narrowing definition and application of criteria, but a public and liberalizing clarification of the relevant criteria. The regulations could undoubtedly have been more clearly drafted and more broadly disseminated, but the Government's shortcomings as evidenced by this record do not rise to the level of

14. Although the twelve-month filing period does not establish a statute of limitations within which to bring a court action, we analogize

equitable tolling of a statute to equitable extension of the filing deadline.

affirmative misconduct required to equitably toll the limitations period.

■ Nor should the INS be equitably estopped from refusing to accept applications past the deadline. Again, even assuming that the clarifying memoranda could and should have been more broadly disseminated, a claim certainly not established by plaintiffs, an agency's failure to fully publicize rights created by Congress cannot give rise to an estoppel against the government. *Lyng v. Payne*, 476 U.S. 926, 935–36, 106 S.Ct. 2333, 2339–40, 90 L.Ed.2d 921 (1986); *INS v. Hibi*, 414 U.S. 5, 8–9, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973).

■ With respect to the QDEs, we conclude that any irregularities involving them established in the record are not attributable to the Government because they were not caused, condoned, or approved by the INS. First, we find that the plaintiffs have not carried their burden of showing that the QDEs were agents of the INS and not mere independent contractors. Accordingly, we expressly decline to adhere to our previous, uninformed characterization of the QDEs as "quasi-governmental agencies under IRCA," Order dated April 26, 1988, and now find that the QDEs were not in fact agents of the INS. Even if the QDEs were agents of the INS, the Government cannot be bound by QDEs' actions that were outside the scope of their authority. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Doe v. Civiletti*, 635 F.2d 88, 96 (2d Cir.1980). In violation of both Section 245a(c)(3) of IRCA and the Agreements they entered into with INS, QDEs admittedly failed to inform applicants of the availability of waivers, pre-adjudicated applications for amnesty, and withheld them from the INS.

The only question remaining, then, is whether any of the alien plaintiffs have established that they constructively filed applications for amnesty *prior* to the expiration of the amnesty period on May 4, 1988. In spite of our repeated emphasis upon this theory of relief, both in previous proceedings and during the trial, *see* Order dated April 26, 1988 at 3; Tr. 622, 624, plaintiffs have not attempted seriously and energetically to establish that any individual members of the class took steps in pursuing amnesty prior to the deadline that would be sufficient to constitute a constructive filing.

■ To establish a constructive filing, the plaintiffs must demonstrate that class members took some affirmative steps to attempt to file properly a timely legalization application. *See, e.g., In re Thornburgh*, 869 F.2d 1503, 1516 (D.C.Cir.1989) ("The constructive filing argument ... entails a showing that the aliens in question complied with the statute by attempting to file [legalization] applications in a proper and timely fashion"); *In re Naturalization of 68 Filipino War Veterans*, 406 F.Supp. 931, 940 (N.D.Cal.1975) (naturalization petitioner who had timely filed appropriate form commencing naturalization proceedings took the only affirmative step a prospective petitioner could take under the INS's regulations and had, therefore, constructively filed such petition).

■ Here the testimony of all but one of the alien witnesses established that, having received erroneous information regarding their eligibility, they made no effort to substantiate that information with either the INS or a QDE, let alone file a timely application. Additionally, the one witness who did have contact with a QDE did not personally discuss her eligibility with anyone from that organization.

For example, Maria P. testified that she consulted Julio Hernandez after she had heard that a child's receipt of public assistance would disqualify a parent from legalization eligibility. Tr. 407, 411. Mr. Hernandez, however, was neither a Government official nor an employee of a QDE. Tr. 416. Similarly, Miriam B. testified that she consulted with a private attorney and two unidentified Catholic immigrants' rights organizations concerning her legalization eligibility. Tr. 479–83. There was no evidence offered to establish that either organization was a QDE. Tr. 490. Additionally, even though Ms. B. was informed that the public charge ground could be

waived, Tr. 483, she did not apply for amnesty because she was told by the immigrants' rights representative that her chances of being approved were "next to nothing." Tr. 483.

Moreover, three of the class members, Jenny C., Sonia R. and Rosa C., made absolutely no effort to inquire as to their legalization eligibility after they heard that receipt of public assistance by themselves or by their children disqualified them from the program. Jenny C. claimed that she met a friend in May 1987 who told her that she was ineligible and showed her a document, relating to a different phase of the program, which stated that receipt of "certain kinds of public assistance" disqualified *temporary* resident aliens from adjusting their status to that of a *permanent* resident. Tr. 426–28; Pl.Ex. 30. Ms. C., who still had approximately one full year to clarify her legalization eligibility status, made no further inquiries. Tr. 435.

Similarly, Sonia R. admitted that her children did not even begin to receive public assistance until July or August 1987, *after* she had heard that receipt of such benefits would make her ineligible for legalization. Tr. 447–49; 451–52. Yet, she also made no further effort to clarify her amnesty prospects. Although she indisputably had about a three-month window of opportunity within which to file, she did not do so at the behest of her father-in-law and because she wanted "to wait a while" after her recent marriage. Tr. 451–55.

Rosa C., who claimed that she first believed herself to be ineligible for legalization "some months" after the start of the program, Tr. 460–61; 462–63, also failed to confirm that information with either a QDE or the INS. Finally, while plaintiff-intervenor Linda Loe testified that her mother attempted to clarify Ms. Loe's eligibility with a QDE, Concerned Citizens, Ms. Loe did not personally discuss her prospects with anyone at that organization. Tr. 395.

In similar cases, courts have found a constructive filing only if the applicant has taken all affirmative steps to comply with the relevant statute before the expiration of the statutory period. For example, in *In re Petition of Vacontios*, 155 F.Supp. 427 (S.D.N.Y.1957), this Court, deeming a naturalization petition timely filed even though it had been submitted beyond the statutory one-year deadline, explained:

> When one takes *all necessary affirmative steps* to comply with the literal requirements of a statute and is prevented from complying fully by the failure of an administrative agency to take the steps necessary to permit his compliance he will not be barred from asserting his rights under the statute.

*Id.* at 433 (emphasis added) (citations omitted). Relying on *Vacontios*, the Northern District of California in *68 Filipino War Veterans* held that naturalization petitioners who had taken the " 'only affirmative step a prospective petitioner could take under the Service regulations,' " had constructively filed their naturalization petitions. 406 F.Supp. at 940 (citations omitted).

More recently, the District of Columbia Circuit rejected the Government's argument that prospective IRCA applicants were foreclosed from establishing that they had constructively filed their applications. The court explained, however, that this was because:

> it is entirely possible that some members of the class in this case could show that they took affirmative steps to file before May 4, 1988, thus, warranting a finding of constructive filing. If, for example, a[n] ... alien went to an INS office and was turned away on the basis of 8 C.F.R. § 245a.1(d), the alien's action might have been "the only affirmative step a prospective petitioner could take".... Consequently, that action might be considered "the constructive equivalent of filing a petition" for amnesty.

*In re Thornburgh*, 869 F.2d at 1516 (citations omitted).

In sharp contrast to the foregoing, the effort expended by these witnesses during the filing period simply does not rise to a level sufficient to find that they had constructively filed their applications. At most, some of the witnesses claimed that they took some steps to inquire about their

eligibility from non-governmental sources. None of these witnesses, however, took any affirmative, conscientious step to actually file an application. Indeed, *none* of these witnesses contacted the INS to inquire about filing during the amnesty period. Nor has *any* person come forth during this entire case and alleged that he or she was turned away at an INS legalization office because he or she had a welfare-dependent child. In short, the alien witnesses in this case have utterly failed to establish that they took "all necessary affirmative steps" to perfect their claims. We therefore find that the plaintiffs and class members did not constructively file timely amnesty claims.

Accordingly, the Clerk of the Court is directed to enter judgment in favor of the Government, and the complaint is dismissed.

SO ORDERED.